ADAM McNEALY, APPELLANT, vs. JASON GREGORY, APPELLEE.

1. The courts of this State derive their jurisdiction from the State constitution. They cannot assume jurisdiction not granted, or which is denied, although the effect may be that the obligation of a contract cannot be enforced. The jurisdiction of the courts is no part of the obligation of a contract. The last clause of section 26, article xvi. of the constitution, provides that " all judgments and decrees rendered in any of the courts of this State since the 10th day of January, A. D. 1861, upon all deeds or bills of sale, or upon any bond, bill, note, or other evidence of debt, based upon the sale or purchase of slaves, are hereby declared set aside, and the plea of failure of consideration shall be held a good defence in all actions to said suit." *Held*,

2. That this action is legislative, not judicial; that it prescribes a rule for the action of the courts in reference to a particular class of judgments upon their records; that it is a law operating retrospectively upon the contract; that its effect is to make that which was a good consideration for a contract, at the time and place it was entered into, not a good consideration; that this is to destroy the obligation of the contract, and it is therefore void. The abolition of slavery or the emancipation of the slave does not destroy the right of action which a vendor of the slave so emancipated has against the vendee, who owned the slave at the time of his emancipation, and any action of a convention of this character, which directs the courts to hold otherwise, is void, as it impairs the obligation of the contract.

3. If the purpose of the convention in this clause was to destroy all the right of the plaintiff in execution in this judgment, as a punishment for

making this species of property the subject of sale, or for any other act, then, viewed in this aspect, it becomes a bill of pains and penalties, and is void.

4. If it is regarded as the exercise of judicial power by the convention, the result of which is to set aside the judgment, then it is the exercise of a power by the delegate which had not been conferred, and the delegate possessed no inherent power of the character here exercised ; nor could such an act become valid by receiving the sanction of a majority vote of the people. A citizen of the United States, in time of peace, has a right, under the constitution of the United States, to have his rights to property made the subject of adjudication and investigation by no other tribunal than one which is a part of a government republican in form, such as a court of the United States, or of a State, where the judicial powers of government are confided to a recognized judicial department, controlled in their judgments by the law of the land ; nor can the people, by a simple majority vote, give validity to the void act of a body of delegates which deprives the citizen of his property without due process of law.

Appeal from a judgment rendered in the Circuit Court for Calhoun county.

In March, A. D. 1866, Adam McNealy brought an action of assumpsit against Jason Gregory, in the Circuit Court of Calhoun county, upon a promissory note of Gregory, payable to A. H. Bush, or bearer. Certain pleas, raising questions in reference to the interest of the plaintiff in the note, were filed. No plea was filed setting up the fact that the consideration of the note was the price and value of a slave sold by the payee of the note (Bush) to the maker, Gregory. McNealy obtained a judgment on the 25th of October, A. D. 1866, and execution issued thereon. This judgment was reviewed by this court upon a writ of error at January term, A. D. 1869. It was affirmed and the case remanded, (12 Fla., 579.) At the October term, A. D. 1869, of the Circuit Court for Calhoun county, and after the mandate from this court had reached that court, Gregory, the defendant in execution, filed his petition in the Circuit Court, alleging that in *March, A. D.* 1860, he purchased a slave of Allen H. Bush, to whom he gave a promissory note for the price agreed upon ; that Bush transferred the note to Adam

McNealy, and that the note upon which the said judgment of the 25th of October, A. D. 1866, was based, was this note so given for a slave. Upon the filing of this petition, and without notice to the plaintiff in execution, an order was made setting aside the judgment, reinstating the case, and giving the defendant liberty to plead the matter of the consideration of the note, as well as directing the sheriff to return the execution then in his hands to the clerk's office, and to suspend proceedings thereon. Gregory then interposed a plea, alleging that the note was given for a slave. At a subsequent term, a motion of the plaintiff to set aside this order as being made without notice or an opportunity for hearing, was denied, whereupon a demurrer to the plea was interposed and overruled. Plaintiff, excepting to the ruling of the court upon the demurrer, there rested his case. A final judgment for the defendant was then entered. This judgment was peculiar. It declared both the facts and the law of the case. It recites that the note upon which the action was brought was given for a slave; that the constitution declared that no action should be maintained thereon. It then directs the suit to be dismissed for want of *jurisdiction* to hear and determine the same; that the plaintiff take nothing by his action, and that the defendant recover fifty-one dollars for his costs in this behalf expended. The plaintiff now prosecutes an appeal to this court, and asks this court to declare that the original judgment is still valid, and to set aside all of these proceedings.

The section in the constitution of this State under which these proceedings were had, is section 26 of article xvi., and is as follows:

" It shall be the duty of the courts to consider that there is a failure of consideration, and it shall be so held by the courts of this State, upon all deeds or bills of sale given for slaves, with covenant or warranty of title or soundness, or both; upon all bills, bonds, notes, or other evidences of debt given for or in consideration of slaves which are now out-

standing and unpaid, and no action shall be maintained thereon ; and all judgments and decrees rendered in any of the courts of this State since the 10th day of January, A. D. 1861, upon all deeds or bills of sale, or upon any bond, bill, note, or other evidence of debt based upon the sale or purchase of slaves, are hereby declared set aside, and the plea of failure of consideration shall be held a good defence in all actions to said suit ; and when money was due previous to the 10th day of January, A. D. 1861, and slaves were given in consideration for such money, there shall be deemed a failure of consideration for the debt : *provided*, that settlements and compromises of such transactions made by the parties thereto shall be respected."

*Geo. S. Hawkins* and *A. H. Bush* for Appellant.

*Geo. S. Hawkins* for Appellant.

I contend, first, that the 26th section of the 16th article of the constitution of Florida is in conflict with the 10th article of the constitution of the United States ; second, that the original contract was legal at the time of its creation, and is so now ; third, that the remedy upon the contract was legally enforced by our laws, and that the Florida convention had no right or power to take it away by legislation, and that in so doing it was an usurpation of authority, and was the exercise of political power.

The note upon which said suit was brought was given for a negro slave, at the date of the contract recognized *as property* by every legal tribunal in the United States before whom the question came, and by all the political departments of the government.

I say that the action of the convention "impaired the obligation of the contract," and thereby is in conflict with the constitution of the United States.

The definition of a contract is familiar to all, but I cite a paragraph from Pothier, (Evans' ed., p. 2, sec. 1 :) "A civil

obligation is a legal tie, *vinculum juris*, which gives the person in whose favor it is contracted the right of judicially enforcing the performance of it."

The remedy or action of the court upon contracts enters into and forms an essential part of them. It may be superfluous to cite authorities upon so generally received a doctrine, but I call the attention of the court to the following : 2 How., (U. S.,) 669 ; 4 Wheat., 197 ; 12 Wheat., where the court says, in speaking of *obligation*, it is a legal and not a *moral* obligation. It is the law which binds the party to perform his obligation. 15 How., 319 ; 1 ib., 332 ; 4 Littell ; 3 Black. Com., 23 ; 1 Kent, 419 ; 3 Story on Const., secs. 1379, 1371-2 ; 4 Wallace, (U. S. R.,) where the court collects all the authorities ; 9 Barb., 482.

The contract, having been originally legal, is it legal now ? (See Smith on Contracts, 69, n. 9, citing 9 Meeson & Welsby, 643.) A State is bound to furnish a remedy for the enforcement of every right of the citizen. 8 S. & M., 58.

Nothing transpired to affect its validity until the action of the convention. It certainly received no taint of illegality owing to any events of the war, or since the 11th of January, 1861. There was temporarily a change of government—a usurpation of the sovereign power of the United States within certain limits, and within those limits there was a government *de facto*—a government possessing all the attributes of sovereignty, and recognized as such by all the political departments of the United States government. Upon this question the judiciary follow the action of the government. 7 Wheat., 336-7. At the close of the contest we may have been considered a conquered country. In such an event, there are no changes in the rights of property, or the civil relations of the people in the conquered territory. 1 Kent, 178, 186, (9th ed.,) citing 5 Robinson, 106 ; 7 Peters, 51 ; 9 ib., 711, 734, 749 ; 12 ib., 410, 438 ; 20 How., 176 ; Hale's History of the Com. Law, Pref., 14.

Judicial decisions remain undisturbed. Grotius, b. 1, ch.

4; sec. 20 ; Book 2, ch. 13, sec. 11 ; 1 Story on Const., secs. 214, 215 ; 3 ib., sec. 1318.

The United States government, the conquering party, has not altered or changed the rights of property in Florida, and no other power can do so.

After the war, our State government existed at the will and by the tolerance of the United States government, and there were no changes in our judiciary system, or interference with our laws, contracts or civil relations.

By virtue of the reconstruction acts, we were permitted to enter the Union. When we did so, we went in as the peer of all the States, with all the powers of State sovereignty, with authority to make and pass laws; *but all laws*, whether made by the *Legislature proper*, or the *Convention*, to be subject and subordinate to the constitution of the United States.

The ordinances or decrees of a convention possess no special sanctity. All legislation is but the declaration of the sovereign will, but when it is that of a State, and in conflict with the constitution of the United States, it is simply void.

We have been compared to Texas when she entered the Union. The cases are not parallel. The ordinances of Texas were passed before the constitution of the United States applied to them. 11 How., 185 ; 14 ib., 79.

The constitution of the United States was applicable to Florida immediately at the end of the war, admitting she had been out of the Union previously. Suit was instituted upon the note about that period. If considered as a State that had never been out of the Union, of course it was applicable. 3 Story on Const., sec. 1830.

The principle seems universal, that a mere change of government, whether by revolution, conquest, cession, or by the State itself, does not affect the rights of persons or property. England, France, and I believe all the nations of Europe, have regarded such rights as inviolable.

The convention has usurped judicial functions and powers which it had no power to do. 5 Hump., 565. It has declared what shall be defences upon a pre-existing contract, thus impairing its obligation. 11 Wis., 353. Its ordinances are retroactive; all laws should be prospective. If the former, and they impair contracts, they are void. 7 Johns. R., 477; 36 Barb., 447.

It is urged that the contract is annulled by a change of the constitution. But this cannot affect a valid contract previously existing. 18 How., 331, 380, 384; 7 Smith, 9; 1 Black., 436.

The convention, in declaring that the note in suit is not collectable, has exercised a political power belonging only to the government of the United States. Such an act is a quasi confiscation. Barclay vs. Russell, 424, cited by Woodbury, J., in Luther vs. Bowdon, 7 How., (U. S.,) 56. It has also invaded the principles of the *social compact.* 3 Dallas, 386; 2 Fla., 102.

An appellate tribunal of the last resort, when satisfied that a law, whether passed by a Legislature or a Convention, impairs the obligation of a contract, and is thereby in conflict with the constitution of the United States, will so declare. 4 Harrington, 389; 3 Story on Const., secs. 1570, 1393, 1426, 1392; 1 Kent, 293, 294.

*A. H. Bush* on same side.

In this case, I contend that the orders by the Circuit Judge at the fall terms 1869 and 1870, of the Circuit Court of Calhoun county, were unadvisedly made; that they were unauthorized by the law of the land, or the practice of the courts, and consequently were illegal and void; that the 26th section of the XVIth article of the constitution of this State, by which only it is sought to uphold them, was and is unconstitutional, considered with reference to the constitution of the United States, because it impairs the obligations

of contracts. I refer to the following cases: 42 Ala., 602, 603, 612, 614; 43 Ala., 224, 230 to 233; ib., 173, 174.

In the case of Lapsley vs. Weaver, it was ruled by Peck, C. J., "that the Circuit Court, neither in vacation nor in term time, had any power to grant a new trial on the application of the defendant in a cause which has been affirmed in this court on his appeal. If said new trial is unadvisedly granted by said court, it is its duty, on the motion of the plaintiff in said case, to set aside and vacate said order granting a new trial, and to strike said cause from the docket." This is precisely our case. Also refer to the following head notes of decisions of the Supreme Court of Alabama: In the matter of the petition of Richard H. Sims, Fitzpatrick, executor, vs. Hearne, from Lowndes county, which is an important case. Ward's administrator vs. Hudspeth, from Henry Circuit Court.

In Lapsley vs. Brashear & Barr, 4 Littell, (Ky.,) 54, the Court of Appeals of Kentucky say: "The obligation of a contract operates through the medium of the sanction of the law, and consists emphatically *in those remedies which the law supplies, and may be denominated the legal obligations of a contract.*" *Ibid.*, page 55, paragraph 2 and last, as follows: "To be in conflict with the constitution, it is not necessary that the act of the Legislature should import an actual destruction of the obligation of the contract. It is sufficient that the act imports an impairment of the obligation. If it be in any degree *impaired*, or, what is the same thing, if the obligation be *weakened* or *rendered less operative*, or is made worse, the constitution is violated and the act so far inoperative. *Ibid.*, 57, 58, 59. See this case to its close. Van Hoffman vs. City of Quincy, 4 Wallace, 535, 548. At 551 the court says: It is also settled that the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and become a part of it as if they were expressly referred to or incorporated in its terms. This principle applies alike to those which af-

fect its validity, construction, discharge and enforcement. The case of Van Hoffman reviews fully all the cases in the United States courts on this important subject. I respectfully ask for it a careful consideration, and refer particularly to the cases of Green vs. Biddle, Bronson vs. Kinzie, Sturges' vs. Crowninshield, at pages 552 to 554, and note †; 4 Littell, 58–9 ; 1 Kent, 445, 456, n. 4; Sedgwick, 652 to 657.

The provisions of the 26th section of the XVIth article of the constitution of 1868 is unconstitutional, because its effect was to deprive the plaintiff of his property without due process of law, and, in fact, against the law of the land.

" The fundamental guards and guarantees " intended to secure vested rights are to be found *first* in the great constitutional restrictions, whether of the Federal or State charters.

1. Private property is not to be taken without compensation. 2. No law is to be passed impairing the obligation of contracts. 3. Property is not to be taken without due process of law, and every individual right is placed under the protection of the law of the land. These three constitutional checks, then, guard private property from the invasions of the State, protect contracts from violation under guise of law, and finally insure to every person impleaded, attacked or charged, the *invaluable right of systematic procedure, notice, evidence and judicial trial.* Sedgwick on Const. Law, 674–5.

The great idea of the protection intended to be conferred by our division of powers into executive, legislative and judicial, is perhaps best expressed by the proposition just stated, that the work of the Legislature is to be confined to the passage of laws as distinguished from judicial and executive acts, and this brings us to the precise question of vested rights, and all may be summed up in the idea that the Legislature can only make laws or legislative enactments as contra-distinguished from judicial sentences and decrees.

28

Sedgwick, 676, 688, note ; ib., 686, note ; 10 Fla., 238, and
the Alabama case at Mobile city, citing as follows : " A
right carried into judgment, though for a penalty, cannot
be disturbed or defeated, notwithstanding the statute author-
izing it may have been repealed." ·1 Hill, 234 ; 1 Black
R., 451 ; 4 Moore & Payne, 341, 351. " A valid State con-
tract or vested right cannot be abrogated by the adoption of
a new State constitution, any more than the enactment of a
law by the Legislature." 1 Black, (U. S.,) 436 ; 18 How.,
331, 380, 383.

An act of the Legislature, (for I cannot call it a law,) con-
trary to the great first principles of the social compact, can-
not be considered a rightful exercise of legislative authority.
·Sedgwick, 154, *et seq.* ; 3 Dallas, 386 ; 5 Paige, 137.; 4
Barb., 64, 74 ; 10 ib., 223 ; 2 Selden, 358 ; 15 Barb., 529 ;
4 Conn., 209 ; 2 Peters, 627, 657 ; 2 Fla., 102.

As to the powers of the courts to declare the constitution
of a State void, as being repugnant to the constitution of
the United States : 1 Kent, 419, 451 to 456, and note as to
remedies ; Sedgwick on Const. Law, 663 ; 1 Cranch, 137 ;
18 How., 331.

*E. J. Simkins* for Appellee.

Appellant bases his first ground of error principally " up-
on the want of notice." 2d. Upon the constitutionality of
the ordinance under which the court acted, which rendered
the judgment below, to-wit : 26 Sec. of Art. XVI¹ of Con-
stitution of Florida.

The appellee claims that the court acted in conformity—
1st, to the law. The petition filed in the circuit court at
the fall term of Calhoun circuit court of 1869 was in the
nature of a suggestion to the said court, that it was lending
its process to enforce a judgment which had been set aside
by the constitution itself.

The notice demanded by appellant was not necessary.
The constitution was notice that there was no judgment.

Appellee did give the only notice required. The judgment being set aside by the constitution, the suit was left pending, and was reinstated upon the docket to enable appellee to file the plea allowed under the constitution. Appellee having filed the plea, gave notice to appellant, who *appeared* and demurred. His appearance was a waiver of a want of notice. Scarlett, trustee, vs. Hicks, admr., and Lang, admx., 13 Fla. He could then have pleaded or had a trial by jury.

The other ground of objection to the order or judgment of the court at the fall term of 1869, was the constitutionality of the constitution in setting aside a judgment obtained in a court of competent jurisdiction upon a legal cause of action, and in that way impairs the obligation of a contract. Is this true? The judgment here set aside by the constitution was rendered at the fall term of 1866.

This court will take judicial notice of the fact, that at this time was existing the government, organized under the auspices of President Johnson, declared by the political department of the United States government to be invalid. See act of Congress, March 2, 1867. Courts are bound to follow the decision of the political department, and this question lay properly within the jurisdiction of Congress. 7 Howard, 1; 3 Wheat., 634; 2 Peters' Cond. R., 98; 4 Wheat., 64. The government being illegal, must necessarily have been unconstitutional, and courts being part, must represent and partake of the character of the government. Courts administer laws which must be valid and passed by the supreme power of the State. The State being under military control and subject to the *paramount power* of Congress, (see acts of Congress 2d March, 1867, July 19, 1867,) the government, so far as preserved, was only the agent of the Congress of the United States to preserve peace. To be courts of any jurisdiction, they must be constitutional courts. 21 Howard, 515; 24 Wendell, 520. There can be no *de facto* courts. 1 J. J. Marshall.

Whether, in 1866, the State of Florida did exercise sove-

reignty and establish a civil goverment, has already been decided by the political branch of the government, the only power which has a right to do so, and all courts must respect and follow that decision.

It was the illegality of the government, and its acts as such, that gave rise to the absolute necessity for a constitutional convention, which not only had to erect a Constitutional Republican Government, but had to go further and examine and revise the acts and proceedings of the illegal tribunals of the past ten years. 5 Texas, 34 ; 21 N. Y., 9 ; see J. Denio's opinion as to powers of a constitutional convention. It was a revisory body, and as such it approved some laws, rejected others ; it abolished the old courts and their officers, established courts of new and different jurisdictions ; it approved certain judgments and decrees and transferred them to the custody and control of the various courts, while others it not only refused to ratify, but declared them set aside, and slave judgments since the year 1861 were thus unratified and set aside.   The courts that have passed these judgments are now defunct.  The courts to-day are not only very different but of different origin, and for them to take cognizance of this judgment and enforce it would be an act of legislation.   It would be hard for appellant to show that a *failure* to approve his judgment was impairing the obligation of a contract.   It can only be remedied by legislation. 38 Ga.  But setting aside a judgment is not *necessarily* impairing the obligation of a contract.

In 2 Peters, 380, it was decided that no part of the constitution of the United States applies to a State law which divested rights which were vested by law in an individual. See also 8 Peters, 88 ; 11 ib., 420 ; 10 Howard, 395 ; 17 ib., 456.

Hence we conclude, that this court has no jurisdiction in this case, because appellant has no judgment to enforce and this court cannot enforce it, because the constitution does not ratify or transfer said judgment to this or any other

court, but sets it aside; and this court must look to the constitution of the State and not to the constitution of the United States for jurisdiction.

But suppose the judgment in this case was rendered after the constitution of 1868 was adopted, the circuit court having overruled the constitution and taken jurisdistion in the case, and thus raise the entire constitutionality of the 26th Section of Article XVI of the State constitution?

Appellee contends that the ordinance in question does not conflict with the constitution of the U. S.  1st. Because when the constitution of 1868 was adopted, Florida was in no constitutional sense a State in the Union.  What is a State in the "United States?"  However sovereign a State may be before admission to the Union, when it entered into the Union it gave up its absolute sovereignty and became in a constitutional sense but a portion of a large empire, and its people a part of the people of the National Government, with limited and local powers.  6 Cranch, (Curtis,) 337.  A State is a member of the Union with certain rights and privileges.  5 Peters, 20.  When Georgia is spoken of as a State, reference is had to its political character.  Ib., 55. But a State not only has the great political rights of representation in Congress, (see constitution U. S.) of power to arrange her local affairs, and say who shall be its citizens and be entitled to protection and favor, but its great aim is to prevent centralization on the part of the general government.  5 Howard, 629; see Justice Woodbury's opinion. Tried by these tests, the State had forfeited her sovereignty—she could claim nothing—she could assert no right, but bowed to military dictation.  After the surrender there was no State organization, but the people were resolved into original elements.  Florida was certainly *not a State then*, for there can be no State without a body politic, and no body politic where there is no government; and that there was *no government* was admitted and asserted by both the President and Congress, (see proclamation and act,) and this

court cannot gainsay it. The government that was set up was overthrown by Congress under the reconstruction acts, and the State of Florida came in as a *new State*, under the constitution of 1868. See argument of Thad. Stephens, July 20, 1867; Coolie on Const. Law, 41. Congress has the right to require certain fundamental ideas of public policy. See Missouri Compromise. So she could require of the State of Florida the abolition of slavery and the adoption of the 13th, 14th and 15th amendments, as the price of her admission; and when the people of the State had adopted the requisition, and had legislated to accommodate the affairs of the people to the new rules of law, and Congress had approved and examined said work, and upon it had admitted the State, the question of its constitutionality for impairing the obligation of a contract cannot be called in question, for it is a well settled principle, that a law or constitution passed prior to the admission of a State into the Union, impairing the obligation of a contract, yet approved by Congress, will not be set aside. A statute impairing a contract in Virginia, before the constitution of the United States was adopted, was held constitutional. 5 Wheaton, 420.

In Scott et al. vs. Jones, Justice Woodbury says: "To give the court jurisdiction, on the ground of impairing the obligation of a contract, there must be an act of solemnity and importance, such as an act passed by a *State*, a member of the Union. 5 Howard, affirmed in 14 Howard, 79. Now the State of Florida, being admitted as a new State on the 25th of June, 1868, is not amenable to the charge of impairing the obligation of a contract. But whether the State of Florida was, during and after the war, a State or not, one thing is certain, by losing their government in 1865 they became amenable to the power of Congress, who alone could decide what measures were appropriate. 7 How., 1. That the act of 1868 is the crowning act of those measures, and it therefore depends upon the authority of Congress, who have dictated parts thereof, and approved and accepted it by sol-

·emn act of June 25, 1868.  The very validity of this gov-
·ernment depends upon its being the act of Congress, because
the constitution of 1868 was mainly adopted by those whom
Congress had freed or enfranchised, and who thus voted
themselves to vote.

Now it is undoubted that the "impairing clause" of the
constitution of the United States only applies to a State, but
does not prevent Congress from impairing a contract.  1
Peters C. C., 337 ; Sedgwick on Statutory and Constitutional
Law.  It is incident to the sovereignty of the United States,
given up by each State, but not by the government.

But this ordinance of 1868, now called in question, can
be easily defended on the plainest principles of justice and
equity.  If the State of Florida has the right to destroy and
take away, *without compensation*, one kind of property from
the people, it surely has the right to take away other kinds.
If it has the power to destroy property in slaves, it certainly
has the power to create courts and deny jurisdiction to those
courts to collect certain classes of contracts.  What distinc-
tion is there in common sense or equity between a slave and
a note given for a slave ?  Why should the rights of the credi-
tor be the only property insured against loss or injury ?  The
government is equally bound to protect all kinds of property.
This case, or class of cases, is a law unto itself.  At one stroke
the government sweeps away fully two-thirds of the property
of the State, and that, too, the laboring classes upon whom
depend the wealth and resources of the land, and yet the
creditor comes in and claims to satisfy a debt for them con-
tracted in times of prosperity, when the property was of
great value, and the contract made by both upon the faith
of the servitude of the slave being continued to work out the
very debt.  There is neither right nor equity in enforcing
such a contract now—it was a case of mutual mistake ; there
is no *quid pro quo*.  We are opposed by 12 Fla., 1, but
strange to say, the decision was made on the presumed in-
tention of the parties, and the presumption was made direct-

ly contrary to the written contract. Again, it was based upon the knowledge which the presiding Judge had of the character of the appellant. 3d. Upon the right of eminent domain in personal property, which is an impossibility, because personal property has no *locality*, because it is an old maxim that *personalis sequiter personam*, and is not, by any possibility, liable to such a claim; and last, the constitution decides against and reverses the decision.

The freeing of the slaves was not intended as a forfeiture for treason—it was the legitimate result of the triumph of free government as opposed to slavery. The act was but the consummation of the higher law principles which had agitated the country for years. Because it was contended that slavery was wrong and immoral, when the slave was freed, was because it was wrong to keep them as such. They were taken from the South, not as property, but as a right to the human being kept in slavery; and Congress approved our constitution because it declared the slave notes void, which were a part and parcel of the same contract; and it was such a contract as tended to the perpetuation of the institution of slavery and to the continuance of the war waged for its defence, and, therefore, Congress declares that the said constitution, prohibiting the collection of said notes, was such a contract as they would accept, and was a legal republican constitution, and when it was so adopted, it became the law of the land.

This court can have no jurisdiction in this case, because it is forbidden by the constitution of the State, made by the people, who are sovereign. There are two kinds of conventions: 1st, to make amendments; 2d, to change the entire frame work of the government. 2 Hill, 222. And when their action is approved by the people, everything is bound to yield. 21 N. Y., 9. As to powers of constitutional convention, (see same case;) when the constitution is formed courts must follow the law as laid down. Cooley on Const. Lim., 44, 45. The courts are to declare the law as

they find it. Ib., 55. It is quite possible, the people, under prejudice, may make mistaken provisions, (3 N. Y., 568, C. J. Bronson's opinion,) but it is the duty of the courts to obey. The people had the right to fix the boundaries, and the remedy must be then in their hands. 24 Ga., 166–7–8; 39 Ga., 442–3. The appellee's remedies lie in the hands of the people, and this court would be legislating to assume jurisdiction.

Courts are sworn to obey the constitution. In Louisiana and Georgia, where there are the same provisions in their constitutions, we cite: 21 La., 527, 567, 757; 39 Ga., 285, 443.

WESTCOTT, J., delivered the opinion of the court.

If the Circuit Court could not make the order opening this judgment by virtue of the constitutional provision, it becomes immaterial whether these proceedings were taken with or without notice to the plaintiff in execution, or were attended with irregularities in other respects, as in either event they must be set aside. This is, therefore, the question which disposes of the case, and meets it fully upon its merits. Analyzing this clause in the constitution, we find that it refers to four subjects matter:

First. All deeds or bills of sale given for slaves, with covenant or warranty of title or soundness, or both.

Second. All bills, bonds, notes, or other evidences of debt, given for or in consideration of slaves which are now outstanding and unpaid.

Third. All judgments and decrees rendered in any of the courts of this State since the 10th day of January, A. D. 1861, upon all deeds or bills of sale, or upon any bond, bill, note, or other evidence of debt, based upon the sale or purchase of slaves.

Fourth. When money was due previous to the 10th day of January, 1861, and slaves were given in consideration for such money.

As to the first two subjects, the constitution first prescribes a *" duty of the courts,"* which is to *" consider "* that there is a failure of consideration ; second, it provides, in the most positive language, that the *courts shall so hold ;* and, in the third place, it declares that no action shall be maintained upon the contracts or evidences of indebtedness before mentioned. None of this language admits of a doubt as to its meaning, except the last clause.

It has been maintained upon one side that this last clause is a denial of jurisdiction to the courts, while upon the other it is insisted that this clause refers only to the right of the parties to the action ; that the previous portion of the clause makes it *the duty of the courts to consider a subject which can only be raised by a plea to the merits, viz : the consideration of the contract, and directs the court as to its judgment ;* that this clause, therefore, makes it the duty of the courts to exercise jurisdiction and pronounce judgment ; and that, for these reasons, it is essential, if we are to give a consistent construction to the whole clause, that the latter portion should be held to be a denial of the *right of the parties* to maintain an action, and not of *jurisdiction in the court* to hear and determine the suit, for this is necessary to discharge a previously prescribed duty to " consider " and " hold." Again, it is said that even if it applies to the court, it is in effect a direction not to maintain the action in favor of the plaintiff, but to pronounce judgment for the defendant ; that it is a direction as to the manner in which the courts shall exercise a jurisdiction previously granted in express terms, rather than a denial of it. A decision of this question involves the consideration not alone of this clause, but of all the clauses of the constitution having reference to like subjects matter, viz : indebtedness accruing from the sale of this species of property and the jurisdiction of the courts.

If the jurisdiction was denied to the Circuit Court, it certainly should not have exercised it, and we certainly cannot direct it to exercise it. Speaking of the matter of

jurisdiction, Chief Justice Marshall remarks : " We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution." If the case was not within the jurisdiction of the Circuit Court, then the fact that the party seeks to enforce the obligation of a contract could not give jurisdiction. If the jurisdiction of the Circuit Court, under the constitution, does not extend to a particular class of contracts, then that court cannot take cognizance of them. Because all remedy upon the contract is destroyed, by organizing no tribunal to enforce it cannot give jurisdiction. The effect of this action is not to change the law applicable to the contract, but to destroy the power of the party to enforce that law by creating no court which can consider it. The jurisdiction of the courts is no part of the obligation of a contract. It is the means through which it is enforced. Courts possess implied and resulting powers from general grants of jurisdiction. Thus, a court invested with criminal jurisdiction, has a resulting and implied power to summon a grand jury, (1 Brock., 159,) but they have no inherent jurisdiction, (7 Cranch, 32.) We do not, however, think that this question arises in the case of judgments. The constitution, in the case of judgments, sets them aside. It then directs, in positive language, what shall be " held " a good defence to the suit in which the judgment is set aside. The effect of the whole clause would be simply to enable the court to open the judgment and permit the filing of a plea. The necessary result is, that instead of denying jurisdiction, it simply directs the manner of its exercise. Even if the terms, " no action shall be maintained," would be held to be a denial of jurisdiction as to contracts mentioned in the first clause, we would be obliged to make an exception of cases in which judgments had been rendered, as in these cases a certain plea is made a good plea, and it is directed that it shall *be held a good defence by the court in this suit*, and it cannot be so held by the court in any other

manner than by the court giving judgment for the defendant upon the merits. This disposes of the question of the jurisdiction of the Circuit Court in this case.

It is not denied that the consideration for the note upon which the judgment is based was the price of a slave. Was the judgment, however, a judgment rendered in the *courts of this State*, since the 10th day of January, A. D. 1861, within the meaning of this clause of the constitution? This question is material, for if it is not such judgment, then the blow aimed by the constitution does not reach it. The language used presumes the existence of the State of Florida since January, 1861, as well as the existence of courts of such State during that period. A very casual examination of sections 1, 2, 3, 4 and 7 of article XV, and section 27 of article XVI of the constitution, shows that this judgment is a judgment rendered in the courts of this State within the meaning of the constitution. These causes expressly recognize the existence of conventions of the people of the State of Florida, as well as the existence of legislative, executive and judicial departments of the government of the State of Florida. They recognize that there were " acts and resolutions of the Legislature, acts and resolutions of the General Assembly, official acts of civil officers of the State and actions at law in the courts of the State, since January, 1861." And what is more important in this case, the convention expressly declares that " all judgments and decrees rendered in civil causes in any of *the courts of the State* since the year 1861, are of full force, validity and effect." The declaration, it will be seen, is not that these judgments *shall be* valid, but they are declared to be then valid.

From section 4 of article XV, it will be seen that the convention declares null and void all indebtedness by the State of Florida after the 10th day of January, 1861, and before the 25th of October, 1865 ; and that it mentions authorized liabilities of the State of Florida contracted prior to the 10th day of January, A. D. 1861, and subsequent to the 25th day

of October, 1865, placing them both on the same footing. In view of all these provisions, we do not think the conclusion can be avoided, that this was a judgment of a court of the State of Florida within the meaning of these terms in this clause of the constitution, and we think it also apparent that, in the opinion of this convention, the court which rendered this judgment was a court competent to render valid judgments.

The judgment of the Circuit Court, rendered in this cause in 1866, is therefore one of the judgments which was declared set aside.

Whether this was a judgment of a court of the State of Florida is a question quite different from the one just answered, viz : whether it was such *within the meaning of the constitution.* The true nature of the subject matter upon which the convention acted must be determined before we can intelligently examine its powers in reference thereto. Was this a valid judgment, and if it was, what is a judgment of a court of competent jurisdiction? Having answered these two questions, we have only to determine whether there was power in the convention to do what is here done in the premises. This judgment was rendered by a court organized in conformity with the constitution of 1865, which constitution was formed at the instance of the President of the United States. We deem it entirely unnecessary, in determining this question, to enter upon any discussion of the various theories of restoration and reconstruction which have been the source of so much political controversy. If the theory of the President was correct, then the judgment is certainly valid; and if this theory was wrong, and that of Congress correct, then the judgment was equally valid. The Supreme Court of Alabama has gone as far as any judicial tribunal in denying power to the President in the premises, and in admitting the *paramount* power of Congress over this subject.

This precise question came before that court in the case

of Powell vs. Boon, 43 Ala., 459, upon a motion to set aside a judgment rendered by the Supreme Court of Alabama under the government instituted by the President. The court held that although the government, organized under the authority of the President of the United States, was declared afterwards to be an illegal government by Congress, yet as the acts of Congress do not declare such government to be void, but permit it to be continued as a provisional government, said government thereby became a legal provisional government, and its acts and the acts of its officers are legal and obligatory upon the people of the State.

The Supreme Court of the United States, in the case of Texas vs. White, 7 Wallace, 731, while declining to enquire into the constitutionality of the legislation of Congress "so far as it relates to military authority or to the paramount authority of Congress," yet it decides that Congress regarded and treated this government as provisional, and remark that "the terms of the acts necessarily imply recognition of actually existing governments."

In either case, therefore, the judgment rendered was valid.

This judgment being a valid judgment, we next enquire, what is a judgment in contemplation of law? This judgment was final and absolute. It is not pretended in this case that there was anything connected with the proceedings in the Circuit Court which would have authorized the court to open it. "A final judgment is a contract. Contracts or obligations of record consist of judgments, recognizances, and statutes staple." 1 Parsons on Con., 7. Contracts by judgment impose the highest obligation known to the law, and although there is in such contracts no promise in fact, the law implies a promise, and it is upon this principle that debt lies upon the judgment of a court of record. Chitty on Con., 23. A final judgment is also property. It may be owned and the fruits of it enjoyed by the owner.

Thus disposing of these preliminary questions, we have only to determine whether the convention had power to do

what this section proposes to accomplish. There is one acknowledged limitation upon the power of the delegates assembled in this convention, and that is such provisions of the constitution of the United States as apply expressly to the States. That constitution is the " supreme law, and the judges in every State are bound thereby, anything in the constitution or laws of the State to the contrary notwithstanding." It provides that no State shall pass any bill of attainder, any law impairing the obligation of contracts, or *ex post facto* law.

What was the character of this act of the convention ? Was it legislative or judicial ? This is material in considering the subject. Did it prescribe a rule to be followed, or did it itself follow a rule ? This is one of the principal distinctions by which we determine whether an act is legislative or judicial. One prescribes a rule to control others, the other follows a rule made by itself or some superior authority. The first is legislative, the second is judicial. Another difference is that judicial acts follow notice, while legislative are without notice. In the very nature of things, so far as the courts are concerned, this clause, viewed as a whole, prescribed a rule of action for the disposition of a certain class of judgments then upon the records. The court which rendered the judgment had finally adjourned for the term years before. After this adjournment, the judgment was final and conclusive. The court had no power over it. There are some exceptions to this rule, but there is nothing in this case which brought it within these exceptions according to the then and now general rule upon the subject. What was this new rule now prescribed? It was, that notwithstanding a final judgment was upon the record ; that notwithstanding no plea was filed in the case suggesting the fact that the consideration of the contract was the price of a slave sold, yet upon a suggestion of such fact, and of its proof in case of an issue, the court should open the judgment ; that it should then permit a plea to be filed setting up such fact,

and that the court should hold such plea a good defence. As a matter *of fact*, the convention could not and did not itself open the judgment. It had no record before it in the exercise either of original or appellate jurisdiction, and not-withstanding its declaration that it was set aside, it was not in point of fact opened until the order of the Circuit Court to that effect. When the motion was made, the court looked to the constitution for the law of the motion for the rule to guide its action. The record of the judgment was in the Circuit Court, the execution was in the hands of the sheriff. The convention did not act upon this particular case. It acted upon a class of judgments, upon the rights of a number of individuals, without respect to any privity of contract between them. Its action could not be judicial. No case was made, no suit instituted, no parties were contesting before it, no service of process, no notice. In the very nature of things, no case could ever be made in which different judgments and decrees in distinct cases, some in courts of law, some in courts of equity, could be opened by one general order. It could not be judicial action, for that proceeds upon the view that in the opinion of the convention the judgments were not valid, as matter of law, while the convention, as we have seen, expressly affirms and declares that they were valid. Viewed in this light, that is, as prescribing a rule, the clause must be valid as a whole, and is not divisible. Its effect is to destroy a judgment, valid according to the views of the convention, by the exercise of a power superior to the obligation of the contract, or, which is the same thing, the law of the contract when made. As a consequence, it not only impairs the obligation of the contract, but it abolishes, nullifies and destroys all obligation which attached to the contract. That rule which directs a court to open a valid judgment for the plaintiff, and make an illegal judgment for the defendant, certainly impairs the obligation of the contract upon which the judgment for the plaintiff was based, for it changes the law applicable to the

contract in an essential respect, and that is, its obligation. To be more precise, the consideration, which is a part of all contracts, was in this contract the price of a slave sold. It was a transfer of something recognized as property by all law in force in the place of the contract at the time it was made. This was, in the eye of the law, something of value moving from the payee to the maker of this note, and that is its consideration. This note was then a promise made for a legal consideration, not a promise without a consideration, or *nudum pactum*. The promise with a consideration has a legal obligation attached. The law will enforce it, while it will not the promise without the consideration. The result is, that when you take from the contract the consideration, you leave a promise, and nothing but a promise, and the consideration which is essential to the legal obligation is destroyed. If you destroy the consideration, you destroy the obligation. It makes no difference that an act of this character is by a State convention, as the prohibition of the constitution of the United States extends to the act of a State, whether through its Legislature or a convention of this character. Such is the decision of the Supreme Court of the United States, which may review our judgment in this respect, and which is necessarily binding upon us in all matters within its jurisdiction. When this rule, prescribed by the convention for the control of the Circuit Court in the matter of opening this judgment, is in conflict with the rule prescribed by the constitution of the United States, which is the supreme law, anything in the constitution of this State to the contrary notwithstanding, the court should have followed that rule which was the law, and not something which was not law. When the motion was made to open this judgment, the court, if it had taken a correct view of the law, must have seen that the only judgment it could render was for the plaintiff, and as that judgment was already of record, it should have refused to disturb it.

We have thus considered this provision in the light of a retrospective law operating upon the contract and the rights of the parties. This, we think, is the correct view to take of it. It is not alleged in this record as a fact that the slave, which was the consideration for this note, was emancipated, and the emancipation of this particular slave cannot be presumed from the fact that all slaves were emancipated some five or six years after the sale. This, however, is immaterial, for if this fact is admitted, it is in law no failure of consideration. The sovereign thus disposing of the property of a vendee, does not affect the right of the vendor against the vendee. The abolition of slavery, or the emancipation of the slave, does not destroy the right of action which the vendor of the slave so emancipated has against the vendee who owned the slave at the time of his emancipation, and any action of a convention of this character which directs the courts to hold otherwise is void, as it impairs the obligation of the contract. There is another aspect in which it may be considered. It may be insisted that it was the purpose of the convention to inflict a punishment upon the payee of this note for the moral wrong of acknowledging and actually dealing with this property as a consideration for a contract. In other words, of making it the subject of a sale, or that it was a punishment for acts of hostility to the United States, this class of judgments as a general rule being owned by those persons who had been guilty of treason in the opinion of the convention. In either aspect, it would be a bill of attainder, a bill of pains and penalties, " a legislative act which inflicts punishment without a judicial trial." 4 Wall, 323. It would be a legislative enactment depriving a man of his property as punishment, without any of the ordinary forms and guards provided for the security of the citizen in the administration of justice by the ordinary tribunals. 4 Wall, 325. It would be a conviction and sentence pronounced by the convention, the punishment inflicted being determined or fixed by no

previous rule, and without opportunity for hearing or defence. If this was really the purpose of the provision and its result, it is entirely immaterial that the language used does not expressly disclose the purpose, for the laws deal with the result. In the language of the Supreme Court of the United States, when speaking of a bill of attainder, "the constitution of the United States deals with substance, not shadows. Its inhibition was levelled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment under any form, however disguised. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding." 4 Wall, 325-7. There is another aspect in which this clause may be considered. This is, that the power exercised was in part judicial, and in part legislative; that in part it declares the law applicable to a given state of facts, and in part prescribes a rule for the Circuit Court. In other words, that the convention, in setting aside the judgment, exercised a judicial power, the result of which was, that in contemplation of law, the judgment rendered in the Circuit Court was set aside and effectually destroyed, and that no court has authority to review or disregard the judgment of this high and supreme tribunal.

We have already given the reasons for our conclusion that the whole clause was the exercise of legislative power, and necessarily void; but if this construction is admitted to be correct, it does not alter the result. This construction involves a division of the clause. As to the rule prescribed in the latter portion, we have already seen that it conflicts with the constitution of the United States, and that the Circuit Court, if it acted at all, could not follow it. The subject acted upon here was a judgment, which is as much the property of the plaintiff as his horse or his house. In this aspect of the case, we have a judgment destroying it. The judgment is made without either notice, hearing or trial. In

other words, property is lost without due process of law, and the right of possessing this particular property is absolutely destroyed and denied. According to all theories of government in this country, while property may be subject to many burdens, and the owner's right of controlling and using it may be properly subject to regulations necessary, as matters of internal police and for public benefit, yet such an exercise of power as this is pure despotism. It pertains to no known attribute of government in a republican system. This convention was not an assembly of delegates representing a people in a state of nature, with no higher title to their possessions than occupancy, or with no better protection than their strong muscle and individual physical power. They represented persons whose right to property was then a right ascertained and fixed by law, whose rights of property were secured by law, made by authority equal to that which this convention possessed. These rights were secured by rules prescribed by delegates possessing like authority to these delegates, for, in the very nature of things, some organic law was operative at the time, and whether it was the constitution of 1861, 1865, or 1839, is immaterial, as they each contain provisions adequately protecting rights of property. Even if Florida was a territory, these rights were as fully protected by the constitution of the United States. These delegates did not exercise original powers, but a delegated authority. If they were selected for a defined purpose by the people, and when assembled they do acts clearly not within the scope of their agency, and exercise powers which were then in another body of magistracy by a previous grant from the same power which called them into being, and the time for which this previous grant had been made had not expired, then the exercise of such powers must be beyond their authority. What was the act here performed? It was an exercise of the *judicial power* of government. Was this convention called for any such purpose? If it was, or if it had the power to try one case, or

to exercise judicial functions in one instance, where is the limit? Could they not have organized themselves into a permanent judicial tribunal to hear and determine cases? If they could exercise such judicial powers, could they not also have exercised executive and legislative powers, and thus constitute themselves the repositaries of all the powers of government for the purpose of their exercise? Could they not have given one month to the trial of causes, another to the making of laws, and another to the appointment of officers to execute those laws? To exercise the functions of government, at the same time prescribing their own rules to control their judgment, is a power which cannot appertain to a body of thirty-three or four individuals in this country, and such acts, if attempted, are revolutionary and unauthorized. This would be the government of an oligarchy or aristocracy.

This convention was called to frame a government republican in form, to delegate or distribute the powers of government to legislative, executive and judicial departments, according to a recognized republican system. For all the purposes of *exercising the powers of government*, there was a body of magistracy, at the very time that this exercise of judicial power took place, to which the trust of *exercising the judicial powers of government* was confided by the people of the State, by the Congress of the United States, and by the President of the United States. Even this convention itself recognized, as we have before shown, the validity of its acts.

Suppose the defendant in this cause had filed a plea in the Circuit Court, setting up that the consideration of this note was a slave; that the Circuit Court, as it must have done, had sustained a demurrer to this plea, and that to its final judgment upon the demurrer a writ of error issued from the then Supreme Court of Florida to the Circuit Court—suppose this cause had been heard in the Supreme Court on the very day that this clause was adopted by the

delegates to this convention, and the judgment of the Circuit Court had been affirmed, the judgment is set aside by one tribunal, and it is affirmed by the other. Upon the prosecution of a writ of error to the Supreme Court of the United States, you would carry a certified copy of the constitution as the record of your judgment in one case, and a judgment roll of the Supreme Court of Florida properly certified in the other. Can it be doubted which judgment would be regarded as the judgment of the highest State court by the Supreme Court of the United States? We have here two inconsistent judgments, covering the same subject matter, between the same parties, in the same jurisdiction, each court claiming to be the highest court in the State. This is a possible case. In such a condition of things, what is the only rule of law or logic to solve it? It is the one we have stated. *Exercising* the judicial power of government was, under the existing constitution, the laws of the State, and the acts of Congress, a trust and power committed to the then existing judicial tribunals.

As matter of power, force, and revolution, this convention might have tried and condemned an individual without notice, in the same manner as the property of appellant was disposed of. It would have been well for them, however, to have had sufficient power to sustain themselves against a minority opposed to them and in favor of the law, for they might themselves, perhaps, have been legally tried and hung. As a matter of law and government under constitutional forms, these things could have been done only by the tribunals then existing, to which this power and authority was confided by law, and whose powers these delegates could not exercise without usurpation. In the case of Rose vs. Hemely, 4 Cranch, 241, Chief Justice Marshall said : " A sentence, professing on its face to be the sentence of a judicial tribunal, if rendered by a body not empowered by its government to take cognizance of the subject it decided, could have no legal effect whatever. The power of the court is,

then, of necessity examinable to a certain extent by that tribunal which is compelled to decide whether its sentence has changed the right of property. The power under which it acts must be looked into, and its authority to decide questions which it professes to decide, must be considered." The rule is the same when applied to judicial acts of this convention.

In the view which we take of the matter, the rights of the people are not limited by any superior power, nor does our solution lead us to the conclusion that there is a power superior to the people. The conclusion reached is, that this convention had no inherent powers of sovereignty, but that the delegates were limited by the extent of the power delegated to them by the people.

True it is, that when the new government was organized, the authority to exercise the powers of government passed into a new body of magistracy. This was because the time for which the first grant was made had expired. It may be urged in this case, that this constitution has been submitted to the people, and has received their sanction, as well as the sanction of Congress, and that admitting that this act of the delegates to this convention was void, being in excess of their authority, yet having been approved by the people, and the State having been admitted by Congress, it became valid and effective. As to Congress, its action extended no farther than to affirm, by admitting the representatives of the State to its councils, that the government of the State, which was to operate in future, was republican in form. As to the effect of a majority vote of the people, the act of the delegates being void for want of authority, the question arises whether this was not an act which the people themselves could not, under existing law, perform, except through a delegate. Now there was a recognized legal method of making changes in organic law. That method was not by a simple majority vote of the people; and we cannot perceive how a ratification of a void act by such majority vote would give

it validity, especially when this act operates as a denial of
the authority over the same subject matter in another body
of magistracy who possessed all legitimate authority in the
premises.    This view makes it within the power of the dele-
gates, where the vote is taken upon the entire constitution,
to force the people to take a part of a whole which they do
not desire, or else reject the whole.    A majority of the peo-
ple by so voting cannot set aside a judgment of the Circuit
Court, or give additional validity to an act of the Legislature,
or make an unconstitutional act effective.    Why then should
the addition of an unauthorized act of their delegates to this
majority vote accomplish that result ?    If thirty-two or three
men possess all power, legislative, executive and judicial,
and are governed by nothing except their fancies or prejudi-
ces in the exercise of these powers, this cannot be a re-
publican form of government.    To admit that this power
exercised arbitrarily by a convention can be made valid by
a majority vote of the people of a State, is to admit a power
in them to deny to a citizen of the United States his right
under the counstitution of the United States, and existing
organic law of the State, to have his rights to property in
time of peace adjudicated in judicial tribunals of the gov-
ernment of the United States or the government of a State,
where the powers of government are distributed to legisla-
tive, executive, and judicial departments, according to a re-
cognized republican system, and where the exercise of these
powers is regulated by law.    The power of the people of a
State who propose to act with reference to their obligations
under the constitution of the United States, does not extend
to abolishing the republican form of government, and the
institution of an aristocracy or oligarchy.    It is true that no
claim is made to any title of nobility by these delegates, but
that is immaterial.    We must look to the act.  (Cooley's
Con. Lim. 17, 18, 33 ; 4 Wall, 277 ; 1 Black., 436.)  So far
as the rights of appellant are concerned, if they are destroyed,
they are destroyed by the arbitrary exercise of power by a

few men, whose power is not regulated by law. If the people themselves attempt to abolish the republican form, it is revolution ; and the legality of such an act as this involves the power to abolish that form, for it is entirely inconsistent with it. What the effect would be if this select body sustained themselves by force, and became in fact a government, it is not material to consider, for that is not this case.

But even if it is admitted that these delegates had the right to exercise judicial powers, it is important to enquire whether they were not controlled in its exercise by rules which then existed, or which they themselves prescribed for the exercise of all judicial power, and which the people ratified by their votes. If this was the exercise of judicial power, then it was a judgment depriving the citizen of his property, without either notice, an opportunity for hearing, and without a trial. The bill of rights, declared but not established by these delegates, declares that the right of possessing property is an inalienable right. The right of the appellant to possess this particular property is here destroyed, although declared inalienable. The bill of rights also declares that no person shall be deprived of property without due process of law. This is a right declared to be beyond and above their power. In this case, the property of the plaintiff in the judgment was destroyed, if at all, without either notice, an opportunity to be heard, and without trial. This was without due process of law. If this provision in the bill of rights amounts to anything, it is a fundamental rule of law applicable to any and all authority in the State that proposes to exercise the powers of government. It was a limitation upon all judicial power which the convention acknowledged existed then. It was an acknowledged limitation upon their own powers. When such a judgment as this was presented to the Circuit Court, it should have examined into it to ascertain its character in this respect, and if it was rendered without notice, hearing, or trial, and without any appearance, it should have disregarded it as be-

ing contrary ·to a rule which in this country governs and controls every tribunal exercising judicial powers, no matter what may be its character. Every court has authority to examine collaterally the judgment of another court to this extent ; and even when it is offered only as evidence, if such defects exist, it must diregard it. (3 How. 763.)

Such an act at this time would be in conflict with the fourteenth amendment to the constitution of the United States, which provides that no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, *nor shall any State deprive any person of life, liberty, or property, without due process of law*, nor to deny any person within its jurisdiction the equal protection of the laws.

We have thus considered this clause in the constitution in two different respects, as the exercise of either legislative or judicial power. It cannot be claimed to be executive. We have treated it—

First. In its true character. That is, as a law operating retrospectively upon the contract and the rights of the parties. In this aspect it impairs the obligation of the contract and is void.

Second. We have considered it as if intended as punishment. Then it becomes a conviction and sentence passed by the convention, the punishment inflicted being determined by no previous rule, and without opportunity for hearing or defence. In this aspect it is a bill of pains and penalties, and is void.

Third. If it is the exercise of judicial power, simply setting aside the judgment, then it is the exercise of a power by the delegate which had not been conferred, and the delegate possessed no inherent power of this character. Such an act could not become valid by receiving the sanction of a majority vote of the people, because a citizen of the United States in time of peace, under the constitution of the United States, has a right to have his right to property made the

subject of investigation by no other tribunal than one which is a part of a government republican in form, such as a court of the United States or State governments; and the people by their votes cannot give validity to the void act of a body of delegates which deprives the citizen of his property without due process of law.

All of the proceedings of the Circuit Court affecting the judgment rendered in this case on the 25th day of October, A. D. 1866, and the process issued thereon, and from which this appeal is prosecuted, are set aside, and the case is remanded for such proceedings as are consistent with this opinion and the principles of law.